(567 P.2d 22)
No. 48,393

BLAIR, MATLACK, ROGG, FOOTE & SCOTT, P.A., Administrator de bonis non of the Estate of James O. Stafford, Deceased; JODY STEPHENSON, RUSSEL WILKINSON, THOMAS J. JENNINGS, a minor, by and through his mother, natural guardian and next friend, BETTY RAE STAFFORD; and ANGELA STAFFORD, a minor, by and through her paternal grandmother and next friend, EVA MILLER, *Appellants,* v. FIDELITY LIFE ASSOCIATION, a Mutual Legal Reserve Company, *Appellee.*

Opinion filed June 3, 1977.

*Robert R. Arnold,* of Bachman, Arnold & Graybill, of Wichita, and *Alan Joseph* of Blair, Matlack, Rogg, Foote & Scott, P.A., of Wichita, for the appellants.

*Laurence A. Stanton* and *Mark H. Adams, II,* of Adams, Jones, Robinson and Malone, Chartered, of Wichita, for the appellee.

Before ABBOTT, P.J., FOTH and SPENCER, JJ.

SPENCER, J.: In an action to recover the proceeds of a thirty-year decreasing term life insurance policy, the trial court found that the policy had lapsed prior to the death of the insured for nonpayment of premiums, entered judgment for the defendant, and plaintiffs have appealed.

For brevity, all of the several appellants will hereinafter be referred to as plaintiffs and the appellee as defendant.

Trial was to the court, which made findings of fact and conclusions of law as follows: (Paragraph numbers have been supplied.)

1. "Plaintiff is Administrator De Bonis Non of the Estate of James O. Stafford, Deceased, and Letters of Administration were issued by the Probate Court of Sedgwick County, Kansas, on November 21, 1972. Defendant, Fidelity Life Association, a Mutual Legal Reserve Company, is a corporation authorized to engage in the life insurance business within the State of Kansas. Defendants, Jody Stephenson, Russel Wilkinson, Thomas J. Jennings, and Angela Stafford are the contingent beneficiaries of the life insurance policy issued on decedent, James O. Stafford, on September 1, 1970.

2. "James and Betty Rae Stafford were joined together in wedlock in January, 1970. Betty Rae brought into this marriage three children by former marriages: Jody Stephenson, Russel Wilkinson, and Thomas J. Jennings. James brought into this marriage one child by a former marriage. Angela Stafford. No children were born of this marriage.

3. "In April, 1970, the Staffords purchased a home on North Doris Street in Wichita, Kansas. As it turned out this home became the residence not only of James, Betty Rae and Betty Rae's three children, but also Jody's husband and her one year old daughter.

4. "When the home was purchased, it carried a $15,000 mortgage. Shortly after buying the home the Staffords received phone calls from insurance salesmen with respect to various mortgage protection plans. Within a span of several months the Staffords purchased $10,000 worth of mortgage protection from Mutual of New York Life Insurance Company, $10,000 from Standard Life and Accident Insurance Company of Oklahoma City, $25,000 from Aetna Life and Casualty Insurance Company, and, $20,000 from Fidelity Life Association. These four insurance policies totaled $65,000 coverage on a $15,000 mortgage and required monthly payments of $65.28.

5. "Without doubt Betty Rae was business manager of the Stafford home. She wrote the checks, paid the bills and borrowed money. An example of Betty Rae's dominance can be seen in the fact that their Fourth National Bank checking account was solely in her name.

6. "Ron Stratton, a soliciting insurance agent with Fidelity, was one of the salesmen who contacted the Staffords about mortgage protection. In a telephone conversation around July 20, 1970, Betty Rae invited Ron out to discuss insurance with James. On the evening of July 27, 1970, Ron, and Joe Beyrle, Fidelity's state agent, visited the Staffords in their new home. Mr. Beyrle talked to James about mortgage protection while Ron and Betty Rae engaged in 'small talk.' During that meeting, one of Mr. Beyrle's primary functions was to establish Mr. Stratton as the company representative; and as the representative of the company, that Mr. Stratton would take care of all problems that might arise, and Mr. and Mrs. Stafford for all their needs should look to Mr. Stratton as the company's representative to assist them. At the conclusion of Mr. Beyrle's sales talk, James, after soliciting Betty Rae's approval, filled out an application for insurance. James elected to pay on a monthly basis with premiums to be automatically taken out of Betty Rae's bank account with the Fourth National Bank. (Betty Rae proceeded to

pay the first month's premium, which, by the time James' insurance policy was approved, covered the month of September, 1970.) This was the last contact James or Betty Rae had with Joe Beyrle.

7. "Subsequently, James took a medical examination. In the latter part of August, 1970, James' insurance policy was approved by Fidelity's home office in Fulton, Illinois and was sent back to Ron. On the 29th of August Ron delivered it to the Stafford home. Ron went into great detail explaining the policy's terms to James and Betty Rae. He went over the entire policy with them explaining that James had taken out a $20,000, thirty-year decreasing term insurance policy. Ron explained that the insured, James Stafford, was the owner of the policy and that the monthly premium on it would be $22.90. Ron emphasized the premium would be due on the first day of each month as provided on page 2 of the insurance policy. He went on further to say that premiums were due and payable in advance at the Fidelity home office or when an authorized Fidelity Representative accepted a premium in exchange for Fidelity's receipt signed by the secretary of the company. Ron reminded James and Betty Rae that payment of premiums did not continue the policy in force longer than the time for which the premium payment is made.

8. "With respect to the grace period, Ron told James and Betty Rae that 31 days without interest charge would be allowed in the payment of each premium after the first premium. Failure to pay any premium on or before the date it falls due would put the policy in default, although it would continue in force during the grace period.

9. "Ron also explained that reinstatement of a policy in default would be allowed at any time within five years after date of default in payment of premiums upon presentation of evidence of insurability satisfactory to the company, the payment of all premiums in arrears, and the payment of interest at 5 per cent per annum.

10. "Ron informed James and Betty Rae that only the application and policy constituted the entire contract. He explained that only the President, Vice President, Secretary, or Assistant Secretary could change, modify or waive the policy provisions and then only in writing. He pointed out the policy provisions which stated that, 'No agent or person other than the above named officers has authority to change or modify this policy or waive any of its provisions.' Finally, Ron pointed out that under the terms of the insurance policy, Betty Rae was made beneficiary.

11. "While visiting with James and Betty Rae on the 29th of August, 1970, Ron was also given the October, 1970, premium. A thriftway card was then filled out authorizing the Fourth National Bank to honor drafts on Betty Rae's account.

12. "In September, 1970, Betty Rae telephoned Ron to request that contingent beneficiaries be added to the insurance policy. Ron honored this request and added, as contingent beneficiaries, Betty Rae's three natural children, Jody Stephenson, Russel Wilkinson and Thomas Jennings. He also added James' daughter, Angela, who was not living with the Staffords. Some time later when the insurance policy was returned from the home office, Ron delivered it to the Stafford home.

13. "Ron had no further contacts with the Staffords until the month of November, 1970. Some time around the 20th of November, 1970, Ron received a

letter from Fidelity informing him that the November premium had been returned for insufficient funds. Ron immediately notified Betty Rae of this fact and she replied that it was the bank's fault so she was going to change banks. She then asked Ron to come out and write up a thrift card on a new bank. Ron honored this request and sent in the notice of change to the home office. Betty Rae made no effort to pay Ron the November, 1970 premium.

14. "During the first part of December, 1970, Ron received a second notice from Fidelity informing him that Betty Rae had not paid the November, 1970, premium. This notice was sent to Ron, C. A. Longhofer and Associates, Inc., and Joe Beyrle. Ron called the Staffords and talked to Betty Rae about the lapsed policy. He explained to her in detail what was the effect of a lapsed policy. He told her the only way to reinstate the policy so as James would be insured was to pay all premiums in arrears—that being the premiums for November and December, 1970. Betty Rae replied that it would take awhile to raise the money but she would try.

15. "At all times Fidelity Life Association dealt with Betty Rae as the agent of James O. Stafford, the insured, and developed a business custom of discussing insurance matters with her and accepting payments of premiums from her.

16. "On or about December 28, 1970, Ron received a letter from Fidelity Life Association directing him to collect from James the November, 1970, thrifway (sic) check. Ron next heard from Betty Rae on December 28, 1970. She telephoned and asked him to come by her home that evening and pick up the November and December premiums. Ron agreed to pick up the cash but told her the insurance policy had lapsed and would not be reinstated until accepted by the home office.

17. "That evening he drove out to the Stafford home, picked up the money in the amount of $45.80 in cash and wrote out a receipt acknowledging this fact. At that time he told Betty Rae that he was not sure the policy could be reinstated in time for the January, 1971, billing since she was paying so late in December, 1970. Betty Rae nevertheless asked him to send in this money for her and also asked him to change her method of payment from the thriftway plan to billing her directly.

18. "Later that evening Ron sent the payment via an agency check to Fidelity's home office, and pursuant to Betty Rae's request, asked them to change her method of billing. Fidelity Life Association never sent any documentation to James and Betty Rae stating that the policy was reinstated, nor did the defendant, Fidelity Life Association, return the premium payments in the amount of $45.80 to James and Betty Rae. Nor was any direct monthly billing ever received by James and Betty Rae after the request was made.

19. "Betty Rae paid no premiums in January, 1971, and, as a result, the policy lapsed on February 1, 1971.

20. "Ron next heard from Betty Rae on February 2, 1971. When Ron arrived in his office there was a message on his desk to return her call. Ron called Betty Rae and was informed by her that she had not received a bill from Fidelity for the January premium as had been requested. She asked him to come out and pick up the premium.

21. "Ron's conversation with Betty Rae concerning the effect of paying the January, 1971 premium came over the telephone on February 2, 1971. When Ron returned Betty Rae's call she asked him if by paying the January premium this would put the policy back in force. Ron replied that payment of the January

premium would probably reinstate the policy once it was received by the home office.

22. "That evening Ron drove out to the Stafford home. When Betty Rae realized she was unable to come up with enough cash she asked Ron if she could write a check which he would hold because she did not have enough money in her bank account to cover it. Ron replied that he would hold the check for her.

23. "At this point there is some dispute as to what Ron next told Betty Rae. It is the position of Betty Rae and all those claiming under the policy that she asked Ron if holding this insufficient fund check would put the policy back in force. Ron, at the first and second criminal trials, paraphrased their conversation as:

'And she said, now, if I write a check, will this constitute payment, and I said, well, yes, I think it will.'

As Ron explained, this was the essence of Betty Rae's conversation rather than the actual conversation between them. Betty Rae never used the words 'constitute payment.' Those were Ron's words at the two criminal trials as an explanation for her question, 'Will you mail this in for me?' and his reply that he would 'mail it in for her and this would be the same as her mailing it in.'

24. "After Ron indicated he would hold Betty Rae's check she proceeded to write an insufficient fund check on the Fourth National Bank. She informed Ron of this fact and asked him to return on February 3, 1971, so she could exchange the insufficient fund check for cash. Ron agreed to do this, then accepted the check and without looking at it placed it in his briefcase.

25. "When he returned to his office that evening he noticed the check had been back dated to February 1, 1971. To his amazement the check also had been made out for two different amounts. Betty Rae had written in arabic numbers the correct amount—$22.90; but she had spelled out an incorrect amount—'Twenty Dollars and 90/100.'

26. "Ron, pursuant to the agreement with Betty Rae, attempted to pick up the payment on February 3, 1971, but was unable to do so because she was not home. In fact, the evening of the 3rd, she called up and apologized for not being home. Although Ron did not stop by the Stafford home the following evening, February 4, 1971, nevertheless, Ron received a telephone call from Betty Rae's son, Russel, who said his mother asked him to call and apologize for not having been there.

27. "Betty Rae Stafford killed her husband on February 5, 1971, having made no effort to pay Fidelity as she had promised. Betty Rae Stafford, the primary beneficiary under said policy, was subsequently convicted in the District Court of Sedgwick County, Kansas, of the felonious killing of the decedent insured, James O. Stafford.

28. "On February 26, 1971, Mr. Robert R. Arnold tendered a Cashier's Check in the amount of $45.80 to the defendant, Fidelity Life Association. Pursuant to K.S.A. 59-513, as amended, Betty Rae Stafford cannot receive the proceeds of said insurance policy because of her conviction of the felonious killing of the decedent insured, James O. Stafford. Richard A. Schull (sic), on behalf of the estate of the decedent insured, James O. Stafford, made demand on Fidelity Life Association for payment of policy proceeds on Policy Number 348050 issued on the decedent insured, James O. Stafford. Defendant, Fidelity Life Association, refused the demand for payment on the grounds the policy had lapsed for non payment of the December, 1970 premium; and further stated that at the time of James Stafford's death, the policy was not in force.

29. "The evidence does not support the defendant, Fidelity Life Association's, allegations that the policy was entered into based upon misrepresentation, illegal purposes, or with the intention to defraud the defendant, Fidelity Life Association.

"CONCLUSIONS OF LAW

"The Court concludes that while Ronald Stratton may have had authority from the defendant, Fidelity Life Association, to collect premiums, and effect reinstatement of policies which had lapsed, either expressly or impliedly, he had no authority, express or implied, to accept an insufficient or hold check for that purpose. Accordingly, the actions of Stratton on February 2, 1971, did not operate to reinstate the policy in question. Accordingly, the judgment will be entered for the defendant, Fidelity Life Association, for costs against the plaintiff and all other defendants."

Although there has been no challenge to any particular finding of the court, there is an apparent conflict in the facts as set forth in the argument contained in the briefs of the parties. A review of the record reveals that each of the trial court's findings is supported by substantial competent evidence and we accept those findings as the facts in this case. (*Lehar v. Rogers,* 208 Kan. 831, 494 P.2d 1124.)

The policy contained provisions as follows:

"How Premiums are Payable. Premiums are due and payable in advance at the Home Office of the Company or to an authorized representative of the Company only in exchange for the Company's receipt signed by the Secretary of the Company. . . .

"Grace Period for Payment of Premiums. A grace of thirty-one days without interest charge will be allowed in the payment of every premium after the first. If any premium is not paid on or before the date it falls due, this Policy is in default but shall continue in force during the grace period. . . .

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"How a Policy in Default May Be Reinstated. A Policy in default may be reinstated at any time within five years after date of default in payment of premium upon presentation of evidence of insurability satisfactory to the Company, the payment of all premium arrears, and the payment of interest at five per cent per annum, compounded annually, on each unpaid premium from its due date. . . ."

In addition, the policy contained provisions for conversion to a permanent type of insurance without evidence of insurability, the usual clause making it incontestable after the expiration of two years from the date of issue, the ordinary provisions regarding suicide within two years from the date of issue, and for dividends to be credited at the end of the second policy year.

Plaintiffs contend that the policy had not lapsed on February 1,

1971, but instead was in its grace period as of that date, and the trial court erred in its finding to the contrary. They reach this conclusion by noting that the policy had lapsed on December 1, 1970, for nonpayment of premium for November and December of that year; that two monthly premiums were paid on December 28, 1970, which should have been allocated to the month of November, 1970, the grace period, and for the month of January, 1971, and by this means the policy would have been within its grace period on February 5, 1971, the date of death. They argue that to allocate a payment for December, 1970, when the policy was in a lapsed state, would mean that the insured would be paying for no coverage because there was no coverage during that period; that such a result would be inequitable and unfair; and to require payment for December, 1970, where there was no coverage, would require payment without consideration under the contract, which would be unconscionable. This argument is presented as the second point on appeal, but is considered here first, for if in fact the policy was in the grace period on the date of death, there would be no need for further consideration, for clearly, the policy proceeds less the unpaid premiums would then have been due the contingent beneficiaries. However, we do not find the plaintiffs' argument on this point to be persuasive.

Plaintiffs cite authority from the state of Missouri to the effect that such a clause as that contained in the policy relating to reinstatement should be construed to not require payment for lapsed periods of time because "that would require the insured to pay something for nothing." Such appears to be the rule in Missouri. Beginning with the case of *Watson v. Commonwealth Life & Accident Ins. Co.,* 17 S.W.2d 570 (Mo. App. 1929), it was held that to require payment·of premiums accrued during the period of lapse "would require the insured to pay something for nothing," and since premiums should not be required for periods where no coverage was in existence, premiums paid after the period of lapse should be apportioned to the grace period and the period after reinstatement. Subsequent cases recognize and apply the rule. See *Billings v. Independent Mutual Fire Ins. Co.,* 251 S.W.2d 393 (Mo. App. 1952); *Randall v. Western Life Ins. Co.,* 336 S.W.2d 125 (Mo. App. 1960); *Bensinger v. California Life Insurance Company,* 459 S.W.2d 511 (Mo. App. 1970).

A contrary result has been reached in New Jersey. *Feder v.*

*Bankers National Life Insurance Company,* 100 N.J. Super. 458, 242 A.2d 632 (1968) involved a reinstatement clause virtually identical to that presented here. The plaintiffs there presented an argument concerning non-coverage during a lapse period of twenty days between the end of the grace period and reinstatement. If the premiums paid were applied to periods after the non-coverage period, then the policy would have been in effect under its grace period at the time of the insured's death. That is the same argument advanced here. The court said:

> "Plaintiff argues that literal enforcement of the Reinstatement clause as postulated above is unjust in that the insured would be required to have paid retroactively a premium for a period of time during which coverage for death did not in actuality exist, the policy having during that period been in a state of lapse. While that fact is true, so far as it goes, the result is not unfair, and the Reinstatement clause clearly contemplates it, since the insured does get the major benefit of preservation of the original age-determined premium rate—a benefit which can be very substantial if lapse and reinstatement take place some years after original issuance or in any case where reinstatement is had close to the expiration of the five-year period allowed therefor after lapse. There are other collateral policy benefits to the insured in the retroactive character of the reinstatement. The policy reinstatement clause obviously must be given a uniform construction, even in cases where lapse and reinstatement follow within a relatively short period after original issuance." (242 A.2d at 634.)

In the present case, defendant argues that the insured would retain certain unbroken benefits under the policy by virtue of reinstatement: "continuity of policy reserves, contestability and suicide clauses and . . . avoided the operation of any conversion limitation." They point to the rule that reinstatement of a lapsed policy does not effect a new contract but continues the original. *Franklin Life Ins. Co. v. Parish,* 109 F.2d 276 (5th Cir. 1940); *Feder v. Bankers National Life Insurance Company,* supra.

Plaintiffs suggest that this is a question of first impression in Kansas, and so it appears to be. They note the rule in Missouri that ambiguities in insurance policies are to be liberally construed in favor of the insured and against forfeitures or lapse, which is also the rule in Kansas. They suggest that the adoption of their theory would work no hardship on insurance companies, because there would be no coverage during a period of lapse, and it would benefit the consumer who would then be relieved of paying "something for nothing."

As stated in *Goforth v. Franklin Life Ins. Co.,* 202 Kan. 413, 449 P.2d 477:

"The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. Since the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured. If, however, the contract is clear and unambiguous, the words are to be taken and understood in their plain, ordinary and popular sense, and there is no need for judicial interpretation or the application of rules of liberal construction; the court's function is to enforce the contract according to its terms. . . ." (202 Kan. at 417.)

The premium payment section of the policy here in question, which contains the provision relating to reinstatement, sets forth how premiums are payable, defines the grace period, policy years, and how a policy in default may be reinstated. There is nothing which restricts or limits coverage provided in the policy and we find nothing in that section which the average, ordinary, reasonable person with ordinary understanding would not readily comprehend. Furthermore, the trial court made special note of the fact that when the policy was approved by the defendant and delivered to the insured's home, Stratton went into great detail explaining the terms of the policy to the insured and to his wife, Betty Rae.

"If a policy of insurance is clear and unambiguous, the words are to be taken and understood in their plain, ordinary and popular sense, as an average or reasonable person with ordinary understanding would construe them, when used to express the purpose for which they were employed in the policy. . . ." (*Clark v. Prudential Ins. Co.*, 204 Kan. 487, 492, 464 P.2d 253.)

It is true that if the insured had died during the month of December, 1970, while the policy was in a lapsed state, the defendant no doubt would have refused to pay the policy proceeds. It is also true that there were benefits to be derived by maintaining the continuity of the policy in force under the original issue date, not the least of which would be the original age-determined premium rate and other benefits which exist by virtue of the date of issue, some of which are noted above. Since the contract provided for a monthly premium and that premium was not paid on or before the date it was due, the policy was in default, but continued in force during the grace period. If the

premium was not paid within the grace period allotted, it had lapsed, subject to being reinstated as provided in the contract. As stated in *Clark v. Prudential Ins. Co.*, supra, at 491:

"When an insurance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made. (*Braly v. Commercial Casualty Ins. Co.*, 170 Kan. 531, 227 P.2d 571.) . . ."

Accordingly, we hold that the trial court did not err in its conclusion that the policy lapsed on February 1, 1971.

Having so determined, the issue then to be resolved is whether the issuance and delivery of the insufficient fund check by Betty Rae to Stratton effected a reinstatement of the policy.

The trial court concluded that, regardless of whether Stratton may have had the authority to reinstate the policy, he had no authority to accept an insufficient or hold check for that purpose.

Plaintiffs argue that Stratton, as the soliciting agent, had authority to collect premiums and to do so by means of a check, and that actual receipt of the check by the company is immaterial if the agent did receive it. *Riddle v. Rankin,* 146 Kan. 316, 69 P.2d 722. They point out that the giving of a check may be an absolute payment where the parties agree it shall have that effect or where the circumstances clearly indicate that such was their intent, and that this is so even though the check is for insufficient funds and may subsequently be dishonored. They argue that Stratton represented to Betty Rae, who was then representing her husband, the insured, that he would accept the insufficient fund check for the January premium and hold it, and that payment in this manner would put the policy in effect and keep the policy in force.

On the other hand, defendant argues that the statements made by the plaintiffs challenge the findings of the trial court in that they are contrary to those findings; that as a general rule, a premium is not paid where the check given for that purpose is worthless, and at the very most, the check was a conditional payment, the conditions for which failed when Betty Rae failed to pay the cash to redeem it. Defendant also presents arguments as to waiver, estoppel, fraud, and the requirements for reinstatement as contained in the policy.

The trial court made no finding as to the extent of the authority granted Stratton by the defendant, nor do we deem it necessary to do so, for the policy was not to be reinstated in any event until payment of all premiums then in arrears.

The trial court, by its finding No. 21, determined that Stratton told Betty Rae that payment of the January premium would probably reinstate the policy once it was received by the home office. Nowhere in the findings of the trial court do we find a determination by the court that Stratton did accept the no-fund check for the January premium, merely to hold it; but rather, by its finding No. 24, after Stratton had indicated he would hold Betty Rae's check, "she proceeded to write an insufficient fund check on the Fourth National Bank. She informed [Stratton] of this fact and asked him to return on February 3, 1971, so she could exchange the insufficient fund check for cash. [Stratton] agreed to do this, then accepted the check and without looking at it placed it in his briefcase."

As stated in 43 Am.Jur.2d, Insurance, § 565, p. 582:

". . . The ordinary rule is that it will be assumed that the acceptance of a check is conditioned upon the check's being honored upon proper presentation, so that if payment is refused and in the meantime the period in which payment could be made has elapsed, the insurer may declare the policy forfeited for nonpayment of premiums. . . . However, by an express or implied agreement between the parties a check may be taken in absolute satisfaction of the premium claim, so that if the check is dishonored the insurer is not entitled to declare the policy forfeited for nonpayment, but is relegated to its action on the check."

See also 6 Couch on Insurance 2d, § 31:45, p. 53. Whatever reason Stratton may have had for accepting a no-fund check is not made clear from the record, but certainly it is clear from the findings of the court, supported by uncontradicted evidence, that his acceptance of that check was conditioned upon its being exchanged for cash the following day, February 3, 1971. Such was the agreement; but this was not done, even though Stratton, pursuant to the agreement with Betty Rae, returned to the insured's home on that date for that purpose. As stated in *Grant v. Reed,* 165 Kan. 27, 193 P.2d 214:

"The giving of a check by a debtor for the amount of his indebtedness to the payee is not, in the absence of an express or implied agreement to that effect, a payment or discharge of the debt. The presumption is that a check is accepted on condition that it shall be paid. With the exception of a few jurisdictions the authorities are unanimous in supporting this rule. . . ." (p. 30.)

As the exchange of the insufficient fund check for cash was a part of the agreement for the issuance and acceptance of that check,

and that condition was not performed, the no-fund check was not taken as an absolute payment of the premiums required for reinstatement. Even if it might be argued that the acceptance of the no-fund check by Stratton was an extension of credit by him for the amount necessary to reinstate the policy, such would have extended only through February 3, 1971.

In 6 Couch on Insurance 2d, § 31:59, p. 69, we find the following:

"An extension of credit is only effective within its terms. That is, to render an extension of credit effective, the premium must be paid in accordance with the terms of the agreement. . . ."

Whatever may have been the agent's authority to reinstate the policy, reinstatement was not effective until payment of the premiums due for January and February, 1971. The insufficient fund check was not in fact exchanged for cash as had been agreed and the policy was not reinstated.

Judgment affirmed.